Okay, the next cases on calendar are Backlund, United States v. Backlund, Needles, Ames, and Fournier, and Everest. Council, we've tried to give you collectively enough time because there are obviously overlapping issues in these cases. I don't know how you've decided to handle your arguments, but just keep in mind, A, we've read all the briefs, B, we don't need repetitive arguments. So just keep that in mind as you go through, and we'll start with Backlund and see where we go. If you have some advice for the Court, if you've all talked with each other and have some ideas, let me know. Otherwise, we'll just let you proceed. James Buckel, Jr. Your Honor, the only schedule — this is James Buckel representing Michael Backlund. The only scheduling innovation of which I am aware is that Ms. Krista Shipsey, who represents Defendant Ames, has graciously offered to cede six minutes of her time to me. I would ask the Court's indulgence to save that six minutes for the end of all the arguments so that I could have sort of a last word. Kennedy You can save it. If you've got it, you can save it. Buckel Okay. So after the other cases argued, I could come back and give a little  Kennedy All right. Buckel Thank you, Your Honor. Appreciate it. Kennedy As long as you don't use it up in the first part. Buckel I'll do my best. Kennedy All right. Buckel With that in mind, I will present the initial argument for Defendant Backlund. Kennedy Sure. Go ahead. Buckel I would start with the plain language of the regulation. It has two unique features. One is that it includes an element that, to be convicted, you must lack authorization when such authorization is required. The second unique element is this preamble that excludes activities authorized by the mining laws. Now, the first argument I'd like to present is the clean sweep argument that sort of solves all the problems before the Court, which is that fundamentally it's an erroneous implementation of this complicated set of statutes for the Federal Government or for the Forest Service in particular to criminalize disputes of this nature. And the reason it's wrong is because when you have a bunch of statutes dealing with a subject, some of which are under some agency's jurisdiction and some of which are under another agency's jurisdiction, you don't defer to the one agency for the you don't defer to the Forest Service about mining law because that's under Interior. You don't defer to Interior under the Organic Act because that's under the Forest Service. The Court has to look at this whole set of statutes and decide if the agency has made a reasonable accommodation of all these conflicting statutory purposes in this giant mess of statutes. Okay. Now, it isn't the we aren't the first panel to look at this, what you're calling a giant mess. Tell us, in your argument, how do we deal with Doremus, which did address some of these issues? Well, Doremus did not address all Doremus did not even cite many of the relevant statutes at all. There is no evidence that anybody brought before Doremus 471, 472, 22, all these different statutes allocating the authorities between the agencies and establishing the policies with respect to land. There's no evidence that the Doremus Court even understood that there were such things as possessory property rights or understood that Congress had determined to give miners possessory property rights. Doremus is properly understood as a case that says if you execute an operating plan with the Forest Service and you say, here is my plan, here is what I'm going to do, you sign them at the bottom, I agree to this, then there can be a regulation that says if you go outside the plan, that's bad, and you can be attacked for going outside the plan. That was the regulation in Doremus. The Doremus holding has been specifically distinguished in United States v. McClure, which talks about this and says if you have a plan and you agree to do something a certain way, you have to do it that way, and if you don't. But where you don't have a plan, we're dealing with people here who are essentially subsistence miners, because gold is now about $1,800 an ounce. They can live by digging it out by hand. You know, the Forest Service has ground down the mining community to the point where everything is significant. All you're left able to do now is to work. Breyer. Counsel, stay in front of the microphone. We're not a jury. We're a, you know, really dispassionate group. Well, but it's important to understand. I understand. Just stay in front of the microphone, okay? So, you know, I'm sorry. You know, I understand that you obviously have some passion here for your clients, but is your argument basically that because of the nature of their mining, they're not required to have a plan of operations? Is that what the whole thing boils down to? In the excerpts of record for my case, you will see that the district ranger wrote to my client and said, You're perfectly entitled to continue what is called notice-level work, the handwork. You dig it out with your shovel by hand. You put it into the sluice by hand. That does not require anything more than a notice to the Forest Service, not an approved plan of operations. That's what completely distinguishes this case from Doremus. In some of the other cases, Ms. Shipsey's case, he wrote a letter. Do I have to have a plan of operations? No. We're talking about activities that are trivial. We're talking about activities that, in my case, there was a NEPA, a NEPA study, three years of work to find completely insignificant, no environmental impact. These are not cases about depredations on the forest, and that's important for implementing the statutory scheme. Now, were they just out there every day? Were they living on the land? Yes. They're living on the land. Yes. And they're not even allowed, in some cases, they're not even allowed. It's your position that because they're doing minimal mining work, that in order to accomplish that minimal amount of mining work, they're allowed to live on the land. Exactly. This is what mining is. You find a valuable pile of stuff in the middle of nowhere, and you've got to be there to protect it. This is the way the mining has gone for 100 years. And the Forest Service has no authority to regulate that. The Forest Service has plenty of authority to protect the national forests against depredations. The Forest Service has authority to regulate significant environmental impact. See, if a plan of operations wasn't required, why weren't they required to have a permit for extraordinary use or whatever it was called? They're not. There's no permits at all. So they're doing minimal, in your view, they're doing minimal amount of mining, and they can live where their claim is. That's it? What's your argument? I just don't follow that. I'm sorry. If they're not really mining, the Forest Service has all kinds of stuff. Is there any case that supports your proposition? Is there any case? The Kurok tribe, all these cases discussing the notice of intent. In your own case, the Siskiyou Regional Education Project case, you recognized that there was the notice of intent procedure, and then there's a level of mining below notice of intent. It's set forth right in the Part 228 regulations. There's nothing mysterious about it. Now, I know, Your Honor, it might have some concern that these guys are not really miners, okay, or that these aren't really mines, all right? And that's why, for 100 years, we've had these remedies where the Forest Service can go into the Department of Interior and say, wait a minute, this thing is not really a mining claim. And there's a simple administrative proceeding they do. It's not a valid claim. Poof. There's no possessory property rights. All of the concerns I'm talking about vanish. All they've got to do is go into the Department of Interior and say, no mining claim. That's one option they have. The other option they can have is, okay, maybe there's a mining claim there, but you're not really mining. You're just treating this like a summer house. That, they've gone for 100 years into the civil courts, and the courts of Oregon are well prepared to deal with this. I sent you a case in that was decided last week by the chief judge here who says these procedures are perfectly adequate. You know, they've worked for 100 years. There's no reason that this has to be criminalized. And criminalizing it is not consistent with the congressional intent that's embodied in these statutes. Because Congress gave these people a property right, a possessory property right. And if you have a possessory property right, you can be there. Congress wants you to possess it. And Congress has a statute. This land shall be free and open for occupation. And occupation means you can be there. And so you have this crystal clear statutory language, and you have an agency that says, we're going to throw 100 years of precedent in the toilet, and we're just going to start criminally prosecuting people for occupying the land. And it's completely unnecessary to vindicate any purpose that's before the force serves. I've got to say, I don't understand the thrust of your argument. You're saying there's a civil remedy available. You're saying we ought to use a civil remedy. But that doesn't tell me that they can't use a criminal remedy or that the criminal remedy is not available. The thrust of the argument is that their authority to make this a crime comes from the Organic Act. The Organic Act says in order to prevent fires and depredations in the forest, you can make rules. Okay? So the force service should have a rule. You're not allowed to have a bonfire. Okay? But for them to say that the miner's occupation is a depredation within the meaning of the Organic Act does violence to the whole statutory structure. This is not the type of thing that Congress expected the force service to regulate at all. And indeed, if you look in the Organic Act elsewhere, I think it's section 471, it says the force service has no authority to deal in those laws that affect the entry and the title and all of these mining aspects are not part of their legitimate business. And where they've overstepped the bounds is with these test cases they have brought here. There isn't any coherent environmental problem. There's no finding of any abuse. You know, in Doreen. Now, they just went out there panning, were they? Well, there's some that were operating suction dredges or sluices, but basically small-scale hand stuff, yeah. They have shop facilities there. Some of them had tents. Some of them had little lean-to's and stuff where they would process the stuff that they dug up called milling. These are activities that have been done on force service land for hundreds of years. Had generators. Some of them had generators. I don't remember if my client did or not. So we're not just talking about panning for gold. We're talking about occupying a mining claim completely consistent with the intent and design of Congress. And we're talking about it in a fashion that cannot be construed as a depredation on the forest. If you read the statutory scheme as a whole, it is not part of the Forest Service's job to say that mining is a depredation. Did your clients have tents? Tents? I think mine was made out of wood. Some of them had just poles. Ms. Shipsey's client had, you know, four poles. Did they have a travel trailer? A trailer. Some of them had trailers there. By your clients? Just buildings, I think, and a trailer. The trailer was there beforehand. They cleaned up the site. It was only after they finished cleaning it up that the Forest Service suddenly invented this crime to charge them with. Now, so that's the first argument. In your view of the world and the statutes, when does the Forest Service have what do your clients have to do that falls under depredation, as you see it, before the Forest Service can exercise any authority over them? There's some detailed rules set forth in Part 228.4, which talk about using motorized equipment and so forth and so on. But you will find nowhere in the rules a statement that says, if you are staying on the claim in your tent, that is per se something for which you must have a plan. That's not in the rules. That's something that some ranger decides on the fly, which brings me to my second argument, which I would have 90 seconds for, which is, this is a violation of due process to bring these people into criminal court under a statute that says when authorization is required and then say, we're not going to let you prove anything about when authorization is required. And what I should have done. Did you, your client appealed this, didn't he? Yeah. He went through some steps under the, there is an avenue of appeal, is there not? There is an administrative appeal for a ranger's determination on a plan of operations. But that's not what's really involved here, because after the plan of operations was denied, fine, I'll go back to this trivial little by hand mining, no plans required, I'm doing notice level something, something. There is nothing there. Then there's just a letter from a ranger. Now, the government's argument is he could have gone into district court and brought a declaratory judgment action against the ranger on whether this notice level work required authorization to stay there or not. But the theoretical defect in that argument is, under the Forest Service view, he could be prosecuted for the crime whether he brought this declaratory judgment action  What's the point? I mean, it's, it's, there is, there is no due process here, because as you guys said in United States v. Coleman, it shouldn't make any difference who comes to court first, whether it's the miner who comes to court first or the Forest Service who comes to court first. In either case, the question for the court and what is required by due process of law is, is what the agency did here. Let me, let me add. So your position here is that despite what they represented in their plan of operations that, that a forest ranger denied, the first level and the second level, that they went back and reconfigured what they were doing? That's, that's why, that's the whole argument. So they removed all their That's not the whole argument. They removed their power, their power equipment and their No, the buildings And their trailers and, and you were, and you were now suddenly doing panning. Is that what, is that what you're So therefore they didn't, they didn't have to give a notice of intent. The argument is the structures and buildings were all there beforehand. They, they, they said fine, we'll sit there and do our notice level of operations and, and, and that's when the district ranger said fine, now we'll prosecute you. And, and the, the greatest evil of this case, in my opinion, is that they were not even allowed to show that the district ranger's, the district ranger's commands were unreasonable. I mean, we have a Federal statute here that says that the Forest Service's abuse, the Forest Service is a co-tenant with these people. It holds their title in trust. It is a trustee for them under the law. And, and we had, so, so to say that this is just criminal all of a sudden, it, it does violence to this whole stat, this whole structure of mining law that, that is not really, not really something the Forest Service should get any deference for at all. And, and then the worst part is we come into court and the answer is, well, I'm just going to hold as a matter of law that because the ranger said so, authorization was required. Now, I don't think. And we have that argument in the briefs. And you're, you're over time. Okay. That's counting up. I'm taking up some of my six minutes, but I want to say one thing that isn't in the brief. There's a large line of cases out there about failure to obey a police officer. And I should have put this in the brief, but if you look at failure to obey a police officer, every court that has ever looked at that question, whether it's a police officer, a prison guard, the Uniform Code of Military Justice. Counsel, get to the point. Okay. The order has to be a lawful order and it's a denial of due process to not let the minors demonstrate that it's a lawful order. Okay. Thank you. Good morning. May it please the Court. Neil Evans on behalf of the United States. I'll be arguing this Backland case and the Everest case, which is the last one on the  Okay. I think the Court's questions indicate that the strength of the Ninth Circuit law is clearly that the two statutory schemes, 228 and 261, have to be read in conjunction. That's what all the courts have done. That's exactly what the district court did in this case, and it's exactly what the Forest Service did in this case in evaluating Mr. Backland's application through his proposed plan of operation. To answer a couple of the specific questions that were posed to Mr. Buechel, the plan of operations, which is contained at Supplemental Excerpt of Record 1 through 6, says the existing living quarters will be repaired to a usable status, along with a drying room, processing area. Existing pit toilet will be maintained and used. Existing storage shed will be repaired. Powerhouse will house a generator and fuel to be lined with plastic under the structure. This was no daytime panning-for-gold operation. The Backlands, in fact, filed numerous proposed plans of authors of, excuse me, plans of operation. The Forest Service completely and adequately reviewed their applications. They went through every administrative step possible. They notified the Backlands over and over again, as is indicated in our Supplemental Excerpt of Record. You do not have authorization to be on Forest Service land. They had virtually permanent structures out there, and the Backlands did not appeal that final agency decision. Now, his argument is even if they had gone into district court, you could have still proceeded to criminalize the activity. I think in the abstract, that is correct. I think, in fact, what happened in every one of these cases is that the defendants went through an administrative process, remained on public lands for periods of years without any authorization, and a decision was made by the U.S. Attorney's Office to file misdemeanor information. So what should they have done to raise the issues that we're hearing about today, about authority? What was their forum in which to litigate that during or and after the administrative appeal process? As Mr. Buechel recognizes and as the district court recognizes, there were several remedies that they could have taken. They could have filed an APA administrative challenge to the final agency decision. Well, suppose they didn't intend to pursue the degree of activity described in their proposed plan of operation. I thought I heard him say that they ratcheted down what they were doing, so it became more of the subsistence level or panning level operation, less ambitious than they had applied for. Well, excuse me. Well, if that's the case, then I'm not sure that the adjudication of the plan of operation speaks to what their activity was subsequently. I think the record shows that the proposed plan of operation existed, as I've just read, that what was proposed to the Forest Service never changed. And the case law is best. That doesn't speak to my question, though. What if what they did after the plan of operation was turned down changed? That is, they didn't pursue what they described in the plan. They prospected or their processing was at a much lower level such that a plan of operation was not required. With the structures that were on the public land, the agency and the courts will look at the entirety of the mining operation, not just whether or not the miner is out there with just a, you know, a pan. They're going to look at whether or not there's still a structure there. Are there pit toilets? Are there fires? Are there generator buildings? And in fact, all of that continued to remain on public property. Now, the district court recognized. That doesn't quite speak to what I'm focusing on. I'm not clear enough, I guess. The question is, what opportunity is there to adjudicate? And you said, well, they could have appealed the denial of the plan of operation. But if what they were engaged in after that was something other than the plan of operation, then the question again becomes, well, how do they adjudicate it if they're not allowed to adjudicate it as part of the misdemeanor prosecution? They're not trying to do what they got turned down for. They're doing something less. Or it comes up in some of the later cases where the Forest Service says this isn't to the level of a plan of operation. That gets to the general question of what if authorization via a plan of operation is not required? They could have filed, if those hypothetical facts existed, they could have filed a notice of intent, which under the 228 regs is there for those minors who say, I'm not sure if I'm likely to cause a significant service disturbance. It may. Would you come out here and let me know? And, of course, the agency prior to that had gone out there on numerous occasions and evaluated the residents, the other outbuildings and whatnot, and determined that there was a significant service disturbance. Even after they had been the final agency action rejecting the plan of operations, you're telling us that they could have gone, Buckland could have gone back out there, made whatever revisions or changes they were going to do to reduce the level of activity, and given a new notice of intent? Sir, there was nothing to prevent him or Mrs. Buckland from doing that. In fact, I think the record reflects that in 2008 the Bucklands filed yet another proposed plan of operation, which didn't substantially change the operation, the proposed plan of operation that we've been working under from 2006. So, yes, they could have done that. They could have taken those administrative steps. Does that mean that the U.S. Attorney's Office or a law enforcement official couldn't have written them a ticket for a Class B misdemeanor for maintaining a residence on public land? The answer to that question is no. At some point. Just so I understand, if somebody, the regime is, you're describing is, you have levels of activity, and if you think your level of activity as a minor is not going to be substantial, you file a notice of intent, and then you basically ask for a ruling from the Forest Service to say, we agree or we disagree. And if they disagree, then what? That is, they say, no, you have to have a plan of operation because you are above the level of de minimis kind of activity. So, what then? They then have to go through the plan of operation? Correct. And then they have to decide, have that decided through final agency action as to whether or not their plan is approved? Correct. Okay. And if they disagree at that point with what the agency determination is, they, in your view, can go to district court, seek a declaratory action under an APA appeal? Correct. Okay. So, if at the first step they disagree that they need a plan of action, what would they do at that point to challenge it? They would go back to the deciding official, it may be called an authorizing officer within the Forest Service, and challenge that decision. Challenge how? By simply, you could simply write a letter. Write a letter. Okay. And then the letter doesn't change that person's mind. Then what? There's a second level of appeal, I believe. So, they go through the same process. So, there is some appellate process that's laid out in the statute or the regulations that says if you don't think you need a plan of operation and you want to challenge that, there is a path to do that? Correct. And then, again, if the final agency action says, sorry, you lose, then same back to an appeal. Okay. And where are those procedures at that level set out in the regulations? 36, CFR Section 251. And those are the same following a plan of action? Correct. And those are the exact procedures that the Backlands followed in 2007, I believe it was, they received a final agency decision, and they didn't do anything. And they continued to remain on the property with their trailers and their equipment. So, at that point, then, what should they have done if they were going to scale back and say, all right, we accede to your denial of our plan of operation. Therefore, we will scale back. Then you're saying, well, then that put them back into either a special use permit regime or a notice of intent regime? Well, in this instance, given that the discussion with the Forest Service was always about or primarily about year-round residency, and the Forest Service, as reflected in the record, says to the Backlands, we can't approve year-round residency. We can approve basically permanent. Seasonal. Permanent residency. Why not? Because there was a significant surface disturbance and the Forest Service determined that year-round residency was not necessary for, not incident to, the mining. The Backlands were basically living on Forest Service land for free on an annual basis, and they've been doing it since 2004. Well, that seems to be an adjudication of what they're doing. But I really don't understand what the difference is between seasonal and year-round. If you have a valuable location, it's been recognized in prior cases and so forth. There is a significance in maintaining possession of that and protecting the location. You can protect change. You can protect your mining claim without year-round permanent residency. How do you do that? Well, the only way somebody could come in and take that claim, there really is no way for somebody to take that claim from you. It has to be open, notorious, and hostile. And the regulations provide for the Forest Service to limit folks living out there or even the entire scope of their mining operation based on what they're mining and what they're doing out there. It's the balance that the Forest Service strikes is the same balance that the courts have struck in saying you have these mining regulations and the rights of the miners, as well as the right of the Forest Service to regulate all activity on public land. So the Forest ---- Then that's under the degradation theory? That's under the regulations and the law that says that the Forest Service has the right to regulate mining services. Counsel has argued you can go ahead. Counsel has argued that you can't do anything with respect to them unless they come within a degradation level of occupancy. I don't believe there's any support for that argument. Doremus, Weiss, a series of cases have said we're going to balance the mining interests and the right of the Forest Service to regulate activity on public land. Let me ask you, so in your view, what defenses can they raise at these misdemeanor trials? Well, they have the affirmative defense of authorization was either given in fact or perhaps was not required. And the district court recognized that there is a ---- there is an area where, as some of the questions have insinuated, somebody could be out there doing some low level of mining, not causing a significant surface disturbance, but at that level, permanent residency wouldn't be needed to do that level of mining. So did they at ---- I didn't read the transcript of the trial here, but did they offer such a defense? Mr. Backland, I don't believe, offered that evidence. Mr. Everest, which you'll hear at the final appellate, tried to make that argument. And as the district court recognized, it's kind of a catch-22. Either you're mining enough to require permanent residence or you're not mining so much that you don't need to be out there on a year-round basis. If there are no other questions, thank you. Thank you for this phase. Okay. Now, you're going to rebut later at the end, correct? All right. All right. Thank you.
judges: Fisher, Paez, Clifton